[No. S119750. June 30, 2005.]

CHARLES E. MORRIS IV, Plaintiff and Appellant, v.
SILVINO DE LA TORRE, Defendant and Respondent.

## COUNSEL

Estey & Bomberger and Stephen J. Estey for Plaintiff and Appellant.

Robinson, Calcagnie & Robinson and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Daniels, Fine, Israel & Schonbuch, Mark R. Israel; Clements & Knock, Thomas V. Clements, Debra A. Stevens and Michael M. Linley for Defendant and Respondent.

Deborah J. La Fetra and Paul J. Beard II for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.

## Opinion

**GEORGE, C. J.**—As observed in the companion case, *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*), courts long have recognized that businesses such as restaurant proprietors have a "special relationship" with their patrons or invitees, and that this relationship imposes upon the proprietor a duty to take reasonable measures to protect such persons against foreseeable criminal attack (*id.*, 36 Cal.4th at pp. 235–236). Specifically, as we stated in *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814 [59 Cal.Rptr.2d 756, 927 P.2d 1260] (*Kentucky Fried Chicken*), with respect to "ongoing" criminal conduct that occurs in the presence of a restaurant proprietor, there is a duty to warn or "*take such appropriate action as is reasonable under the circumstances* to protect patrons" and invitees. (*Id.*, at p. 823, italics added.)

We granted review in this matter to consider the Court of Appeal's determination that plaintiff, who was injured by third party criminals in the parking lot of defendant's all-night restaurant while defendant's employees watched from inside, stood in a special relationship with defendant, and that defendant's duty to take "such appropriate action as is reasonable under the circumstances" obligated the restaurant's employees to telephone 911 on plaintiff's behalf. We agree with the Court of Appeal that a special relationship existed and that it imposed upon defendant, through its employees, such a duty, and that there exists a triable issue of fact concerning whether defendant breached that duty when his employees failed to make a 911 telephone call to summon aid for plaintiff. Accordingly, we shall affirm the judgment of the Court of Appeal, which in turn reversed the trial court's grant of summary judgment for defendant.

I

■ Because plaintiff's appeal is from a trial court order granting summary judgment for defendant, we independently examine the record to determine whether there exist triable issues of fact warranting reinstatement of the action. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517] (*Wiener*).) ■ In order to prevail in an action based upon a defendant's alleged negligence, a plaintiff must demonstrate that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of his or her injuries. (*Ibid.*) "We have recently observed that . . .

amendments to Code of Civil Procedure section 437c . . . place the initial burden on the defendant moving for summary judgment and shift it to the plaintiff upon a showing that the plaintiff cannot establish one or more elements of the action." (*Wiener, supra*, 32 Cal.4th at p. 1142.)

■ Accordingly, in this matter we must determine whether defendant has shown that plaintiff has not established a prima facie case of negligence. In making that assessment on review of a grant of summary judgment for defendant, we view the evidence in the light most favorable to plaintiff as the losing party below. (*Wiener, supra*, 32 Cal.4th at p. 1142.)[1]

II

Defendant Silvino De La Torre is the proprietor of Victoria's Mexican Food, a 24-hour restaurant located in a small shopping center in San Diego's Nestor area. At the time relevant here (in mid-2000), the other five businesses in the center generally maintained only daytime business hours. A parking area located directly in front of the restaurant serves the entire shopping center. Under the terms of his lease, defendant enjoys nonexclusive use of the entire parking lot and pays 20 percent of the maintenance costs for that common area.[2]

The restaurant has an approximately 40-foot-wide storefront of large plate glass windows that afford an unobstructed view of the parking area; the restaurant posts advertising in the windows that can be read from the parking lot. A narrow dining section is located in the front of the restaurant interior. A

---

[1] Although we view the facts in the light most favorable to plaintiff, we nevertheless require record *evidence* supporting those facts. Because plaintiff's answer brief made numerous factual allegations without citation to the record, we struck that brief and directed the filing of a new brief in compliance with the California Rules of Court, rules 29.1(b)(1) (form and content of briefs) and 14(a)(1)(C) (each brief must support any reference to a matter in the record by a citation to the record), and we also specified in our order that "[a]ny request to augment the record to support the content of the answer brief must comply with the provisions of [California Rules of Court,] rule 12." Although plaintiff's subsequently filed replacement brief contained citations, in many respects those citations referred to matters that were not part of the record on appeal. Accordingly, we ordered plaintiff to file a motion to augment the record. Plaintiff so moved without objection, and prior to oral argument we issued an order granting that motion.

[2] Even as augmented (see *ante*, fn. 1), plaintiff's appellate presentation is deficient and we therefore must ignore a number of factual assertions made in his answer brief without support in the citations provided by plaintiff. One such unsupported factual assertion is plaintiff's specific representation, which he repeated at oral argument, that "[a]fter 9:00 p.m., [the restaurant] has exclusive use of [the] parking lot located directly in front of its premises." The cited authority—paragraphs 18.1 and 18.2 of defendant's lease—contains no such express or implied "exclusive use" provision relating to any prescribed time period, and our independent review of the record has not disclosed any such evidence.

standard-height counter separates that area from an open kitchen. At one end of the counter is a gate at counter height, allowing access from the dining area to the open kitchen. At the other end of the counter, between the counter and the kitchen, a private telephone is mounted on a wall below counter height.

At approximately 1:00 a.m. on August 1, 2000, plaintiff Charles E. Morris IV, along with his friends Bonilla, Rhodes, Miranda, and Gallegos, arrived in Gallegos's car and parked in the described area immediately outside the restaurant. Miranda and Rhodes entered the restaurant to purchase food while plaintiff, Gallegos, and Bonilla waited outside. Plaintiff, a frequent customer of the restaurant, had a stomachache and did not plan to eat.

At about this time Richard Cuevas and Saul De La Vega arrived by car and parked near plaintiff and his companions. Cuevas and De La Vega were members of the Nestor Street gang. Apparently, neither plaintiff nor any of his friends were gang members. Cuevas, approximately six feet tall and bare chested (with the word "Nestor" tattooed on his chest in three-inch letters), approached plaintiff and his companions in a hostile manner and asked where they lived. Immediately thereafter Rhodes and Miranda emerged from the restaurant, and Rhodes attempted to calm Cuevas by offering to shake hands. Cuevas replied that he was "Lobo from Nestor" and was not there to make friends. When plaintiff responded that he was from Imperial Beach, Cuevas punched him, at which point plaintiff's companions began to fight in defense of plaintiff. De La Vega threw two unopened cans of beer at plaintiff and his companions and began to rip off his own shirt; Cuevas ran into the restaurant, yelling to its employees in Spanish slang that he wanted a "filero"—a knife.

Inside, restaurant employees Najera, Coronado, and Hernandez, all of whom subsequently were interviewed by the police, each watched the unfolding altercation and saw and heard Cuevas enter the restaurant and demand a knife. Although there is conflicting testimony regarding how Cuevas entered the kitchen itself, it is undisputed that all three employees watched Cuevas depart from the kitchen with an approximately 12-inch knife. Najera told the interviewing officer that he was frightened when Cuevas entered, and had opened the gate for Cuevas. In a subsequent deposition, however, Najera denied having opened the gate. Coronado stated that he told Cuevas he was not allowed to enter behind the counter, but Cuevas nevertheless barged through the unlatched swinging gate. Hernandez stated that from the kitchen area he had seen persons fighting and had observed Cuevas enter

and demand a knife. Coronado reported that shortly after Cuevas left the kitchen with the knife, he saw Cuevas "bend over a person that was on the ground" and "saw him making stabbing motions."

Approximately 25 feet from where the employees were watching from inside the restaurant, Cuevas stabbed plaintiff at least twice. The employees continued to watch as Cuevas chased Rhodes and Bonilla, who ran out of the parking lot and across a street. Unable to overtake them, Cuevas returned to the car in which plaintiff and his companions had arrived and used the knife to puncture three of its tires. Meanwhile, Rhodes ran to a nearby fast food restaurant where he used a pay phone to call 911.

Cuevas and De La Vega drove off in their car and soon tracked down plaintiff, who had stopped, wounded, on a nearby public sidewalk. Plaintiff was then stabbed several more times. Three minutes and 58 seconds after Rhodes's 911 call, police arrived on the scene.

The entire incident, beginning with the fistfight in the parking lot immediately in front of the restaurant and culminating with the second stabbing attack upon plaintiff, consumed approximately seven to eight minutes. During this time, none of defendant's three employees telephoned the police or any other emergency personnel. Employee Coronado, asked by an investigating officer whether he had called the police, responded that the phone was disabled. Employee Najera eventually made the same statement by deposition. Defendant, the restaurant's proprietor, echoed that assertion in his own deposition, stating that on the day of the assault the phone did not work and that he had contacted Pacific Bell, which sent someone to fix the problem the next day. Defendant possessed no record of such a repair, however, and in response to plaintiff's subpoena, Pacific Bell reported that it had no record of any such problem or repair.

The police arrested Cuevas approximately six months after the assault. The record does not indicate the result of any subsequent criminal prosecution.

Plaintiff sued defendant as well as the shopping center landlord, alleging negligence under a premises liability theory, as well as battery. The trial court initially denied motions for summary judgment filed by defendant and the landlord, but upon further review granted those motions a month later. The court found that although plaintiff had offered some evidence of prior incidents of criminal activity on or near the premises (including various fistfights, robberies, and carjackings), much of that evidence was inadmissible. In any event, the trial court concluded, those prior incidents were not

similar to the criminal activity that caused injury to plaintiff. The trial court also found no competent evidence indicating that defendant or his employees created or increased any danger faced by plaintiff.

Plaintiff sought reconsideration as to defendant only, and thereafter the trial court reaffirmed summary judgment for defendant and entered judgment accordingly. In doing so the trial court concluded that although there existed a factual question concerning whether defendant's employee Najera held open the counter gate for Cuevas, that issue was immaterial because the low gate, even if closed or latched, would not have prevented Cuevas from entering the restaurant's kitchen area. The trial court also rejected plaintiff's assertion that defendant owed a special-relationship-based duty to assist him during the attack that took place in full view of defendant's employees. The trial court reasoned that because plaintiff had remained in the parking lot with no intention of entering the restaurant, he "was not a customer" at the time in question and hence no special relationship existed between defendant and plaintiff.

Upon plaintiff's appeal from the judgment entered in favor of defendant, the Court of Appeal first agreed with the trial court that plaintiff's proffered evidence of prior criminal conduct on the premises was insufficient to establish "heightened foreseeability" that would have required defendant to undertake preventative measures such as providing security guards to protect his patrons. (See *Delgado, supra,* 36 Cal.4th at pp. 236–240 [discussing the "heightened foreseeability" rule].) The appellate court also determined that even if defendant's employee, Najera, opened the counter gate for Cuevas, the evidence showed that he acted out of fear for his own safety, and hence defendant neither owed nor breached any duty to plaintiff in that respect, because a proprietor in this setting "does not have a duty to protect his customers at the expense of his own safety."[3] The Court of Appeal ultimately concluded, however, that the circumstance that plaintiff had failed to establish that defendant had a duty to hire guards or undertake other preventative measures to protect against *future* third party criminal conduct against his patrons or invitees did not signify that defendant owed no duty to take

---

[3] The Court of Appeal reasoned: "In *Kentucky Fried Chicken*[, *supra,*] 14 Cal.4th [814] at pages 828–829, the court held the employees did not owe a duty to comply with a robber's demands for property to lessen the risk of injury to patrons. The facts here present a situation converse to the situation in *Kentucky Fried Chicken*, but a similar conclusion applies. Just as there is no duty for a shopkeeper to *comply* with an intruder's demands, likewise there is no duty for a shopkeeper to *refrain from complying* with an intruder's demands when the shopkeeper is acting out of actual fear for his own safety. Duty involves the balancing of competing concerns—in this instance, the shopkeeper's interest in protecting his own safety as opposed to the shopkeeper's duty to protect customers. (See *id.* at pp. 825–826.)"

reasonable and minimally burdensome measures to aid plaintiff in the face of an *ongoing* attack occurring upon the premises and in the presence of the proprietor's employees. The court concluded that such a duty existed in this case and that there were triable issues of fact concerning breach and causation, and hence that summary judgment improperly had been entered for defendant.

We granted review to consider whether defendant had a duty to aid plaintiff with respect to the ongoing criminal conduct, and that issue is the sole question before us.

### III

### A

■ Duty is, of course, a question of law decided by the court. (*Delgado, supra,* 36 Cal.4th at pp. 237–238; see also *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 676 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*).) ■ As a general matter there is no duty to act to protect others from the conduct of third parties. (*Delgado, supra,* 36 Cal.4th at pp. 234–235.) One exception to that general rule is found in the "special relationship" doctrine. A defendant may owe an affirmative duty to protect another from the conduct of third parties, or to assist another who has been attacked by third parties, if he or she has a "special relationship" with the other person. (See *Delgado, supra,* 36 Cal.4th at pp. 235–236; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 858–866, pp. 220–233 (Witkin); Flahavan et al., Cal. Practice Guide, Personal Injury (2004) ¶¶ 2:856–2:875.4; 2 Dobbs, The Law of Torts (2001) §§ 317, 322–332 (Dobbs on Torts).)

■ As we also observed in *Delgado,* "[c]ourts have found such a special relationship in cases involving the relationship between business proprietors such as shopping centers, restaurants, and bars, and their tenants, patrons, or invitees." (*Delgado, supra,* 36 Cal.4th at p. 235; see *Ann M., supra,* 6 Cal.4th 666, 674 [recognizing as "well established" the proposition that a proprietor's "general duty of maintenance, which is owed to tenants and patrons, . . . include[s] the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures"]; *Kentucky Fried Chicken, supra,* 14 Cal.4th 814, 819 & 823–824, 829–830 [a restaurant proprietor who has reason to believe, from observation or experience, that the conduct of another endangers an invitee, has a duty to take reasonable steps to protect the invitee—but that duty does not include an obligation to comply with an

armed robber's unlawful demand that property be surrendered]; *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806 [205 Cal.Rptr. 842, 685 P.2d 1193] [a special relationship exists between "a possessor of land and members of the public who enter in response to the landowner's invitation"] (*Peterson*); *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 121 [52 Cal.Rptr. 561, 416 P.2d 793] (*Taylor*), and cases cited [a bar proprietor has a "duty to take affirmative action to control the wrongful acts of third persons which threaten invitees where the [proprietor] has reasonable cause to anticipate such acts and the probability of injury resulting therefrom"]; Rest.2d Torts, §§ 314(A), 344.)

■ Finally, as we explained in *Delgado,* even if a proprietor, such as the bar in that case, has no special-relationship-based duty to provide security guards or other similarly burdensome measures designed to prevent *future* criminal conduct (which measures are required only upon a showing of "heightened foreseeability"), such a proprietor nevertheless owes a special-relationship-based duty to undertake reasonable and minimally burdensome measures to assist customers or invitees who face danger from imminent or ongoing criminal assaultive conduct occurring upon the premises. In this regard, we noted in *Delgado* that restaurant proprietors owe a special-relationship-based duty to provide " 'assistance [to] their customers who become ill or need medical attention and that they are liable if they fail to act' " (*Delgado, supra,* 36 Cal.4th at p. 241); and, more to the point, with respect to imminent or ongoing criminal assaultive conduct occurring in the proprietor's presence, such proprietors have a duty to warn or "take other reasonable and appropriate measures to protect patrons or invitees . . . ." (*Ibid.*, paraphrasing *Kentucky Fried Chicken, supra,* 14 Cal.4th 814, 823; see also *Taylor, supra,* 65 Cal.2d 114, 121, 123–125; *Johnston v. Fontana* (La.Ct.App. 1997) 610 So.2d 1119, 1121–1122 (*Johnston*) [restaurant proprietor whose customer threatened to attack another customer had duty to "call[] the police for assistance"].)

B

1

Defendant asserts preliminarily that a showing of "heightened foreseeability" as defined by *Ann M., supra,* 6 Cal.4th 666, and its progeny (see generally *Delgado, supra,* 36 Cal.4th at pp. 236–240) is "a *prerequisite*" to imposing any special-relationship-based duty and hence to imposing liability upon a restaurant proprietor related to the criminal conduct of a third party. Specifically, defendant argues that he had no duty to train his employees to

react reasonably to events such as occurred here, absent evidence of other similar criminal incidents in the past that would have put him on notice to do so.

As we explained in *Delgado*, plaintiff's expansive view of our heightened foreseeability doctrine "is facially inconsistent with our decisions in *Ann M.,* supra, 6 Cal.4th 666, and its progeny, all of which, when articulating and applying the heightened foreseeability doctrine, expressly reaffirm the sliding-scale balancing formula articulated prior to and in our decision in *Isaacs* [*v. Huntington Memorial Hospital* (1985)] 38 Cal.3d 112, 125 [211 Cal.Rptr. 356, 695 P.2d 653], under which we have recognized that, as a general matter, imposition of a high burden requires heightened foreseeability, but a minimal burden may be imposed upon a showing of a lesser degree of foreseeability." (*Delgado, supra,* 36 Cal.4th at p. 243.)

In any event, as the Court of Appeal below observed, foreseeability analysis in a case such as this—involving a proprietor's duty to *respond* reasonably to criminal conduct that is *imminent* or even *ongoing* in his or her presence—contrasts fundamentally with the type of foreseeability at issue in cases such as *Ann M.,* which involve a proprietor's duty to take *preventative* measures to guard against possible *future* criminal conduct. When, as in *Taylor, supra,* 65 Cal.2d 114, 123–125, *Delgado, supra,* 36 Cal.4th at pages 245–246, or *Johnston, supra,* 610 So.2d 1119, 1121–1122, assaultive conduct is imminent—or when, as in the present case, it is actually occurring in plain view—"it requires no mastery of metaphysical philosophy or economic risk analysis to appreciate the strong possibility of serious injury" to persons against whom such imminent or ongoing criminal conduct is aimed. (*Marois v. Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 202 [208 Cal.Rptr. 384].) Defendant's employees, like the establishments' employees in *Taylor, Delgado,* and *Johnston,* readily could foresee the immediate danger posed to plaintiff and his companions. The question posed in the present case is whether those employees (as agents of defendant) owed any duty to plaintiff to take reasonable action for his protection at some point during that ongoing conduct. The answer depends upon whether there existed a special relationship between defendant and plaintiff.

2

Defendant asserts that no special relationship existed between himself and plaintiff because plaintiff, who merely accompanied his friends to the restaurant and did not plan to eat, was not a customer at the time of the attack. As our cases disclose, however, a special relationship exists between

a business proprietor and not only its patrons or customers, but also its *invitees*. (See, e.g., *Kentucky Fried Chicken, supra,* 14 Cal.4th 814, 819 & 823–824; *Peterson, supra,* 36 Cal.3d 799, 806; *Taylor, supra,* 65 Cal.2d 114, 121.) Moreover, courts long have recognized that a person may be an "invitee" even if he or she is not at the time of injury a paying customer: "Prospective customers on the premises of any business open to . . . provide services . . . are easily invitees by any definition." (1 Dobbs on Torts, *supra,* § 234, at p. 600.) Indeed, "[w]hen consistent with the purpose for which the invitation is implicitly or explicitly issued, those who accompany the invitee are themselves invitees." (*Id.,* at p. 601.) For example, in *Farrier v. Levin* (1959) 176 Cal.App.2d 791 [1 Cal.Rptr. 742] (*Farrier*), the plaintiff accompanied her friend to a delicatessen, with no intent to make a purchase there. While on the premises, the plaintiff slipped on a spilled substance and injured herself. After reviewing a number of similar older cases and secondary authorities (*id.,* at pp. 798–802), the Court of Appeal concluded that "it cannot be said that the presence of the plaintiff upon the premises . . . was merely tolerated. [Citation.] She was a potential customer and within the class of persons a merchant normally desires to have observe and inspect his merchandise, whether or not she was in a position to make a purchase on the particular evening." (*Id.* at p. 803.) Because the plaintiff in *Farrier* was a potential customer and hence a person whom a proprietor desired to have visit the premises, she was an "invitee or business visitor" and was owed a special-relationship-based duty by the proprietor. (*Ibid.;* see generally 6 Witkin, *supra,* Torts, § 918 et seq.)

More recently, and on facts similar to those in *Farrier, supra,* 176 Cal.App.2d 791, the Oregon Court of Appeals followed that decision and found sufficient evidence of invitee status and hence of a special-relationship-based duty owed by the business proprietor. (*Walsh v. C & K Market, Inc.* (2000) 171 Ore.App. 536 [16 P.3d 1179] (*Walsh*).) In *Walsh*, the plaintiff was injured by malfunctioning mechanical doors while entering a market. The plaintiff, like plaintiff in the present case, was a regular customer of the business, but at the time in question merely was accompanying a friend and planned only to visit a market employee without making any purchase. (*Id.,* at p. 1180.) The appellate court concluded that under either of two alternative tests of invitee status, the plaintiff was an invitee. It reasoned that under an "invitation" test, "a person is 'an invitee in a store even if [the person] enter[s] only to kill time between airplanes and intend[s] to buy nothing.' " (*Id.,* at p. 1182, quoting 1 Dobbs on Torts, *supra,* § 234, at p. 601.) Moreover, the court in *Walsh* reasoned, viewing the question under an "economic advantage" test, "[w]hat matters is not whether the specific visit offers the

prospect of business dealings but that the visit has a reasonable connection with another visit that does." (*Walsh, supra,* 16 P.3d at p. 1183.) The court concluded that a jury reasonably could have found that "because the [plaintiff's] visit tended to reinforce her general habit of shopping at defendant's store, it provided an economic advantage to defendant." (*Ibid.*)

Although plaintiff, who was a longtime paying customer of the restaurant, did not intend to purchase food from defendant's establishment on the night in question, he was an invitee of the restaurant at that time under the reasoning of the foregoing decisions. Plaintiff arrived with a group of four others and parked immediately in front of the restaurant—an area for which defendant paid extra rent and enjoyed nonexclusive use—and two of plaintiff's companions entered the restaurant to purchase food. As they returned with their selections, the criminal attack upon plaintiff and his friends commenced in full view of the restaurant's three employees. As in *Farrier, supra,* 176 Cal.App.2d 791, "it cannot be said that the presence of the plaintiff upon the premises was merely tolerated"—instead, despite plaintiff's stomachache, he "was a potential customer and within the class of persons a merchant normally desires to have observe and inspect his merchandise, whether or not [he] was in a position to make a purchase on the particular evening." (*Id.,* at p. 803.) And as in *Walsh, supra,* 16 P.3d 1179, plaintiff, present just outside the restaurant's door and windows while waiting for his companions to return with their purchases, was "invited" to be and remain on the premises; moreover, his presence there was closely connected with his companions' purchase of food from the restaurant. (See *id.,* at pp. 1182–1183.) Indeed, absent the business transaction in which his companions engaged with defendant, plaintiff most likely would not have been at that scene and had his unfortunate encounter with Cuevas.[4]

---

[4] Presumably because plaintiff's briefing does not address *Farrier, supra,* 176 Cal.App.2d 791, or *Walsh, supra,* 16 P.3d 1179, neither does defendant's. Instead defendant relies primarily upon *Andrews v. Wells* (1988) 204 Cal.App.3d 533 [251 Cal.Rptr. 344] (*Wells*), which he asserts is "quite similar to the case at hand."

We disagree and find *Wells* inapposite. In *Wells,* a customer (the decedent) was struck and killed by a car on a public road as he walked home from the defendant's bar. The customer had patronized the bar over a period of a few months, and on four or five prior occasions had asked the bartender to arrange for a ride home from another patron. On two of those prior occasions, the bartender had been able to arrange such a ride. On the evening in question, the customer was served one drink by the bartender but was refused further service, because the customer appeared to be inebriated. The customer, as on prior occasions, asked the bartender to arrange a ride home from another patron, but the bartender was busy and did not immediately respond. Less than one minute later, however, the bartender noticed that the customer had departed, and soon thereafter the customer was struck by a car as he attempted to cross a road. The customer's blood-alcohol content was between .35 and .38 percent, indicating that he had consumed a substantial quantity of alcohol prior to arriving at the bar. (*Wells, supra,* 204 Cal.App.3d at pp. 536–537.) In an ensuing wrongful death action, the trial court granted summary judgment for the bar proprietor and the appellate court affirmed, finding no duty

3

■ Our conclusion that plaintiff was an invitee for purposes of the special relationship doctrine is not altered by the circumstance that the fistfight and initial stabbing incidents occurred immediately outside the restaurant's physical structure. It is well established that a proprietor's special-relationship-based duty to customers or invitees extends beyond the structure of a premises to areas within the proprietor's control. We find sufficient control in this case based upon a number of factors: (1) apparently customers and invitees regularly used the parking lot when patronizing defendant's restaurant; (2) defendant was aware of this use, and posted in its windows advertising that could be read from the parking lot; (3) the area of the parking lot where the altercation and initial stabbing occurred was directly in front of the restaurant's windows; (4) defendant's lease authorized the nonexclusive use of the parking area for customers' and invitees' cars; and (5) a reasonable inference can be drawn that defendant realized a significant commercial benefit from his customers' use of the parking lot. (See *Southland Corp. v. Superior Court* (1988) 203 Cal.App.3d 656, 666–667 [250 Cal.Rptr. 57].) Indeed, at the time of the attack (1:00 a.m.), with no other shopping center enterprise then open, the lot as a practical matter was subject to defendant's sole use and control.

4

Plaintiff asserts that because defendant stood in a special relationship with him, defendant owed an obligation to respond to the criminal conduct that was ongoing in his employees' presence by undertaking such *"appropriate action as is reasonable under the circumstances* to protect [his] patrons" and invitees. (*Kentucky Fried Chicken, supra*, 14 Cal.4th 814, 823, italics added; see also *Delgado, supra*, 36 Cal.4th at pp. 246–247 [recognizing bar proprietor's special-relationship-based duty to respond to events that posed an imminent danger of criminal assault upon the premises by "taking reasonable, relatively simple, and minimally burdensome steps . . . to address [that] danger"].) Furthermore, plaintiff asserts (as does amicus curiae on his behalf) that in this

---

under the circumstances to arrange a ride for the customer. In the course of reaching that conclusion, the appellate court cited and relied upon a number of cases that addressed the *negligent undertaking doctrine (id.*, at pp. 539–541; see generally *Delgado, supra*, 36 Cal.4th at pp. 248–249 & fn. 28) and concluded, correctly, that merely because the bartender upon receiving prior requests had managed to procure a ride home for the customer on two occasions, the bartender was not required to " 'continue to render aid indefinitely.' " (*Wells, supra*, 204 Cal.App.3d at p. 541.) The appellate court also concluded that in any event, in view of the circumstance that the decedent left the scene very soon after requesting a ride (and before the bartender had a chance to respond to that request), there was no evidence indicating that the decedent customer had *relied* upon the bartender to arrange a ride for him on the night in question. (*Id.*, at p. 542.)

instance, measures "reasonable under the circumstances" included defendant's employees' use of the restaurant telephone to call 911 in order to summon assistance.[5]

Defendant contests that conclusion, as well as the Court of Appeal's characterization of the obligation to place a 911 call as being a "minimal safety measure that imposes no undue hardship on a business owner." Defendant asserts that "California courts, recognizing the difficulty of imposing liability upon a business [proprietor] for the response of his or her employees to exigent circumstances, have generally declined to impose liability upon the [proprietor] for 'contemporaneous' criminal conduct, even where the response of the employee *worsens* the position of the injured customer or invitee"—and argues that we should decline to recognize a duty on his part to respond reasonably to ongoing criminal conduct. In support, defendant relies primarily upon three appellate court decisions, *Young v. Desert View Management Corp.* (1969) 275 Cal.App.2d 294 [79 Cal.Rptr. 848] (*Young*), *Forrand v. Foodmaker, Inc.* (1986) 182 Cal.App.3d 196 [227 Cal.Rptr. 74] (*Forrand*), and *Hassoon v. Shamieh* (2001) 89 Cal.App.4th 1191 [107 Cal.Rptr.2d 658] (*Hassoon*), disapproved on other grounds in *Delgado, supra*, 36 Cal.4th at p. 244).

In *Young, supra,* 275 Cal.App.2d 294, immediately after a robbery had occurred, a restaurant employee asked others to "get a license number" of the robber's car. (*Id.*, at p. 296.) In response, another employee followed the robber into the restaurant's parking lot, where the robber shot him. The appellate court declined to recognize a duty owed by the proprietor to the injured employee, noting that there was no evidence that the parking lot was a dangerous place or that any of the restaurant employees knew that the robber remained in the parking lot. (*Id.*, at p. 299.) The court also commented that "in the excitement and confusion of an armed robbery, neither victim nor spectators can be expected to react as calmly as observers of a chess match." (*Id.*, at p. 297.) In a somewhat similar case, *Forrand, supra,* 182 Cal.App.3d 196, 198, a restaurant employee who had just been robbed called out "stop him," and in response a customer left the premises, got into his own car, and chased the robber for more than a block before confronting him, at which

---

[5] Contrary to the suggestions of amicus curiae on behalf of defendant, plaintiff does not assert that defendant or his employees had a duty to "rescue" plaintiff, and of course no such duty exists. Employees such as counter clerks, waiters, or cooks have, at most, a duty—as "appropriate" and "reasonable under the circumstances"—to warn, to call 911, or to take other similar minimal action. (*Kentucky Fried Chicken, supra,* 14 Cal.4th 841, 823.) Contrary to amicus curiae for defendant, this limited duty cannot fairly be characterized as calling for " 'deputization' " of business owners and their regular employees, or as " 'inviting . . . unrestrained vigilantism.' "

point the robber shot the customer. Reversing a verdict for the injured customer, the appellate court found the customer's chase to have been an unforeseeable result of the employee's outburst, and declined to "impose a duty which presupposes rational thought during a time which normally produces the antithesis." (*Id.,* at p. 201.) Finally, in *Hassoon, supra,* 89 Cal.App.4th 1191, a store proprietor's clerk noticed a victim being beaten outside the store and rescued him by bringing him inside the establishment. In response, gunshots were fired into the store, injuring a bystander customer. The appellate court concluded that the proprietor and the clerk owed no duty to the customer to refrain from such a rescue. (*Id.,* at pp. 1197–1199.)

Each of these cases, in which courts found no liability for employees' various verbal and physical reactions to crime occurring in their immediate presence, is distinguishable from the present case. The defendant's employee in *Young* had no duty to avoid imploring others to procure the license plate number of the getaway car; the defendant's employee in *Forrand* had no duty to forbear from yelling "stop him" in reference to a fleeing robber; and the defendant's employee in *Hassoon* had no duty to avoid rescuing a victim being beaten outside the store. Similarly, in the present case, had defendant's employees telephoned 911, defendant would not be liable for injury caused thereby, because defendant had *no duty to forbear* from calling 911. But, contrary to defendant's suggestion, none of the foregoing cases prevents recognition of a duty to act reasonably by telephoning 911 as appropriate in order to protect invitees from ongoing crime. Although excitement surrounding an incident certainly is a factor in judging the reasonableness of a defendant's conduct, it cannot inexorably excuse a defendant from *any* duty to act. (See *Kentucky Fried Chicken, supra,* 14 Cal.4th 814, 823.)

█ As the court recognized in *Hassoon, supra,* 89 Cal.App.4th 1191, 1197–1198, the legal duty question is determined by applying the principles set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561]. These factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, *the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach,* and the availability, cost, and prevalence of insurance for the risk involved." (*Id.,* at p. 113, italics added.)

Most of these factors support a finding of duty in this case. The only factor upon which defendant (and amicus curiae on his behalf) relies to argue a contrary conclusion is the italicized one. In this respect, defendant suggests that his employees may have feared that placing a 911 call would endanger

their own safety, that society should not expect such employees (including many teenage minors who work in fast food restaurants) to take such action in similar circumstances, and that in any event for policy reasons there should be no "blanket" duty to call 911 in all situations involving ongoing criminal activity.

We agree with defendant and his amicus curiae that neither a business proprietor nor his or her employees have an absolute obligation to call 911 in the face of ongoing criminal conduct: in some situations, doing so actually might increase the danger to customers or invitees or might unreasonably place proprietors or their employees in danger. (See *Helms v. Church's Fried Chicken, Inc.* (1986) 81 N.C.App. 427 [344 S.E.2d 349] [robber assaulted a restaurant customer after an employee loudly told the customer to call the police; grant of summary judgment for proprietor reversed].) Nevertheless, on the disputed facts presented here, we disagree with defendant that the record establishes, as a matter of law, that his employees had no obligation to telephone 911 or undertake any other similar measure in order to summon aid for plaintiff.

As plaintiff and amicus curiae on his behalf observe, placing a 911 call is a well recognized and generally minimally burdensome method of seeking assistance. Although, as noted above, there may be situations in which the response that is "appropriate and reasonable under the circumstances" includes *not* making such a call—as when doing so unreasonably would increase the danger to a patron, invitee, employee, or anyone else legally upon the premises—we find that as a general matter a proprietor's special-relationship-based duty to its patrons or invitees includes an obligation to make such a call, or to take other similar minimal measures. (*Kentucky Fried Chicken, supra*, 14 Cal.4th 814, 823; *Taylor, supra*, 65 Cal.2d 114, 121, and cases cited; *Johnston, supra,* 610 So.2d 1119, 1121–1122.)

Defendant argues that just as his employees could see out the restaurant's door and windows, Cuevas and De La Vega likely were able to see inside. The employees, he argues, may have feared that they might compromise their own safety if they put themselves in a position in which they could be observed making a call from the restaurant phone—which, defendant asserts, was "visible on the counter." Defendant's specific factual allegation is belied by the record, which shows that the telephone was mounted *behind* the counter and *below* counter height—and thus presumably could have been used unobserved from the outside by one crouching below the counter. In any event, although the record contains evidence indicating that the restaurant employees did not attempt to intervene directly by attempting to prevent Cuevas from taking the knife, because they were afraid of him, and although

the record would support the conclusion that *an* employee in similar circumstances reasonably might decline to call 911 out of fear of gang retaliation, neither point establishes as a matter of law that any of defendant's three employees failed to call 911 because of an actual fear of Cuevas specifically or of gang retaliation generally.[6] Indeed, as noted above, the evidence suggests that the employees failed to make such a call for other reasons unrelated to such fears.[7]

On the present record, we cannot conclude as a matter of law that defendant's employees acted reasonably in declining to place a 911 call or undertake any other minimally burdensome measure on plaintiff's behalf. That disputed issue must be resolved by a jury in connection with its determination of whether defendant breached his duty to plaintiff.

### C

Our conclusion that defendant owed plaintiff a legal duty of care of course will not prevent defendant from presenting evidence at trial and arguing to a jury that his employees did not in fact breach any duty owed because they acted reasonably in light of their fear that placing a 911 call would endanger their own safety. Furthermore, even if a jury were to find a breach of duty, it also would be required to consider whether the breach was a proximate cause of plaintiff's injuries—that is, whether the failure of defendant's employees to act caused plaintiff to incur greater injury than he would have suffered had defendant's employees taken appropriate action toward plaintiff as was reasonable under the circumstances.

### IV

For the reasons set forth above, the judgment of the Court of Appeal reversing summary judgment in favor of defendant is affirmed.

Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

---

[6] Amicus curiae on defendant's behalf cites studies published in 1996 and 2000 for the proposition that prosecutors who were surveyed considered gang intimidation of witnesses to be a substantial problem. We do not doubt this general proposition, but it does not establish as a matter of law that defendant's three employees failed to call 911 at the time in question out of fear for their own personal safety.

[7] There are, for example, indications in the record that the employees may have failed to place such a call because they wished to avoid involvement with the authorities due to their respective immigration status. The police found that none of the employees possessed an official identification document such as a government identity card or driver's license. Moreover, employee Hernandez later explained that he had not wanted to "get involved," because he was "living and working here illegally."

**KENNARD, J.,** Concurring.—As I pointed out in my dissenting opinion in *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 244, 250 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (dis. opn. of Kennard, J.), anyone reading this court's recent decisions in *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207], and its progeny, would conclude that (1) the prior-similar-incident rule applies to premises liability claims against business owners for failing to take precautions against possible *future criminal* conduct of third parties when the conduct is a criminal assault by a third party, and that (2) as suggested in *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 823–824 [59 Cal.Rptr.2d 756, 927 P.2d 1260], the totality of circumstances rule applies when the criminal conduct is *ongoing or imminent.* This case, involving an ongoing criminal assault, falls within the totality-of-circumstances rule. (*Kentucky Fried Chicken of Cal., Inc. v. Superior Court, supra,* 14 Cal.4th at p. 823.)

**BROWN, J.,** Concurring.—I concur in the judgment based on the limited facts before us. Under the specific circumstances set forth, it could very well be the case that the employees may have been minimally burdened to call 911 in the face of the ongoing criminal conduct.[1] I, however, write separately because I do not believe our decision in *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814 [59 Cal.Rptr.2d 756, 927 P.2d 1260] (*Kentucky Fried Chicken*) compels this result.

In *Kentucky Fried Chicken*, we decided "whether a shopkeeper owes a duty to a patron to comply with an armed robber's demand for money in order to avoid increasing the risk of harm to patrons." (*Kentucky Fried Chicken, supra,* 14 Cal.4th at p. 817.) And we held that "there is no duty to comply with a robber's unlawful demand for the surrender of property. Simple refusal to obey does not breach any duty to third persons present on the premises." (*Id.* at p. 829.) We stated that to hold otherwise and recognize a duty would be "inconsistent with the public policy reflected in article I, section 1 of the California Constitution and Civil Code section 50." (*Ibid.*) Both article I, section 9 of the California Constitution and Civil Code section 50 recognize the right of a person to defend property with reasonable force. (*Kentucky Fried Chicken,* at p. 829.) *Kentucky Fried Chicken* stands for this and nothing more. In particular, it imposed no duties on business owners based on any ongoing criminal conduct.

---

[1] Of course, our holding does not establish that the employees breached any duty by failing to do so. Indeed, the employees may have had good reasons for not making the call. They may have feared becoming the assailants' next victims or the possibility of future gang retaliation if they assisted plaintiff.

Although as a society we laud and encourage individuals to come to the aid of others in need, and we celebrate and commend heroic actions, there is a great difference between encouraging selfless actions and imposing liability for failing to act heroically. The special relationship doctrine is an *exception* to the general rule that a business proprietor owes no duty to protect others from the criminal acts of third parties. Thus, this court should proceed with caution when expanding the legal obligations of business owners, especially when the expansion of a duty in these cases may result in reduced services and lost job opportunities in the least affluent sections of our cities. (See *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 258 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (dis. opn. of Kennard, J.).)

Moreno, J., concurred.