Filed 8/30/24  Zhu v. Meng CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ZHU ZHU,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>XIANXI MENG,<br><br>        Defendant and Respondent. | D083785<br><br><br>(Super. Ct. No. CIVSB2200778) |


APPEAL from a judgment of the Superior Court of San Bernardino County, Wilfred J. Schneider, Jr., Judge.  Affirmed.

Callahan & Blaine, Edward Susolik, Brian J. McCormack, and Brett E. Bitzer for Plaintiff and Appellant.

MacDonald & Cody and Edye A. Hill for Defendant and Respondent.

In the early morning hours of March 7, 2021, Zhu Zhu was awakened by screaming in a home in which she was staying as an overnight guest.  Her close friend and host Jia Jia and Jia Jia's eight-year-old daughter, Ruby, were being attacked by an intruder who had entered the home through an unlocked door.  Within moments of being roused from her sleep, Zhu herself was grievously injured by the intruder, and Jia Jia and Ruby lay dead.

Zhu filed suit, alleging negligence against the last occupant of the home to go to bed on the night of the attacks—Jia Jia's husband and Ruby's father, Xianxi Meng. In a first amended complaint (the complaint), Zhu alleged that "Meng, as the owner of the . . . residence, had a duty to his invited guest, [Zhu], to . . . take reasonable safety precautions and make sure . . . all of the doors to the Meng residence were locked and . . . the security alarm . . . turned on prior to going to bed." The trial court concluded Meng owned no duty on the facts alleged and, on this basis, sustained Meng's demurrer and entered a judgment of dismissal. Zhu appeals the judgment, contending the court erred in finding no duty. We disagree. Hence we affirm the judgment.

## I.
### Factual and Procedural Background[1]

In 2021, Rancho Cucamonga—the community in which Jia Jia, Ruby, and Meng resided—had a large and growing Asian population and a property crime rate that exceeded the national average. In this same timeframe, "California had the highest percentage in the country of Asian hate crimes, including, but not limited to, . . . physical assault," and law enforcement authorities, a think tank, and media outlets were reporting a substantial rise

---

[1] Because this appeal arises in the context of a demurrer, we proceed as though all allegations of material fact pleaded in the complaint have been admitted by the defendants. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; *Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 160, fn. 4; see also *Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604 [in considering merits of a demurrer, "the facts alleged in the pleading are deemed to be true, however improbable they may be"].) Thus our descriptions of events preceding Zhu's filing of the complaint should be understood as having been drawn from the complaint. We make no findings as to such descriptions' truth or falsity.

in crimes directed against individuals perceived to be Asian. Among the conditions to which such sources attributed these trends was "anti-Asian rhetoric . . . blam[ing] Asian communities for the spread of COVID-19 in the United States" and "the fact that Asian families generally store a lot of cash and jewelry in their residences."

According to data revealed in one published report, the area of Rancho Cucamonga in which Jia Jia, Ruby, and Meng's home (the residence) was located was "a moderately dangerous location of the city." During the two-and-one-half year period that preceded the March 7 attacks, several violent crimes had occurred or been narrowly averted within various distances from the residence. Among them: (i) a homicide 1.8 miles from the residence, (ii) a would-be looting 2.3 miles from the residence, (iii) a pair of home-invasion armed robberies 2.8 miles from the residence, and (iv) a homicide and home arson an unspecified distance from the residence.

The residence itself had attributes that rendered it more vulnerable to a burglary or other type of home invasion crime than would otherwise be the case: it was located on a corner near a major thoroughfare, it lacked exterior lighting, it could be entered on the ground floor, and visibility and light from the street were obscured by trees and the fence. In addition, Jia Jia, Ruby, and Meng did not have a dog.

The complaint does not allege whether or to what extent Meng may have been aware of crime statistics or of security implications associated with the attributes of the residence just discussed. But it does allege that he was mindful of the importance of home security. Thus, for example, at lunchtime on March 6, 2021 (the day before the attacks), Jia Jia mentioned to Zhu: that she [Jia Jia] and Meng "did not feel safe as a result of the increase in anti-Asian hate crimes . . . in Rancho Cucamonga since the COVID-19 pandemic;"

3

that, due to these fears, they "were increasing security protections" at the residence;" and, more specifically, that they "were in the process of hiring a contractor to update and increase the security protections of the [residence], including, but not limited to, rebuilding the back fence . . . and installing security cameras."

Similarly, the complaint alleges that, at dinner that evening, Jia Jia, Meng, and Zhu discussed their concerns: "that the local community was not as safe as it [had been] prior to the COVID-19 pandemic;" that this was due in part to "increasing home invasions and violent assaults against Asians;" "that . . . crime in general . . . and anti-Asian hate crimes in particular . . . had been escalating in . . . the neighborhood;" "that, as Chinese immigrants, [Jia Jia, Meng, and Zhu] were constantly concerned about their personal safety;" and that Jia Jia and Meng "were afraid of being burglarized as a result of . . . storing valuables inside the [residence and because of] the stereotype that Asians in general store cash, jewelry, and other valuables in their house." In addition, "Meng spoke about his prior purchase of a gun in order to protect the . . . residence in response to the increasing crime rates and increasing anti-Asian hate crimes being committed in Rancho Cucamonga."

The afore-mentioned concerns notwithstanding, the residence was not altogether defenseless. In addition to Meng having purchased a gun to protect the premises and its occupants, the residence was equipped with locks on the doors and a security system, a doorbell camera, and a camera (that Meng himself had installed) with a view of the living room.

Zhu's presence during lunch and dinner at the residence on March 6, 2021, was not unusual. She and Jia Jia "had been very close friends for many years," and she "would regularly come to visit . . . Jia Jia, Ruby,

4

and . . . Meng at the . . . residence." "During these visits, it was common for [her] to spend the night as an invited guest." And on occasions when she did so, "she observed . . . Meng locking the doors and arming the security system before going to bed." In fact, "it was . . . Meng's standard practice to check and make sure all of the doors were locked, including, but not limited to, the sliding glass door to the back patio[,] . . . and [to] arm the security system before going to bed . . . because he knew [it would be] dangerous to the residents and guests of the [residence] . . . if he [were to leave] a door unlocked and/or . . . not arm the security system" inasmuch as that would "greatly increase[] the odds of an intruder breaking into the residence and causing harm to the residents and guests."

Following dinner, Jia Jia and Meng invited Zhu to stay the night "because it would be too dangerous for [Zhu] to drive back to her home." Zhu accepted the invitation. In addition, she followed Jia Jia and Meng's advice "to get all of her valuables out of her car and store them inside the [residence]." Thereafter, Jia Jia, Ruby, and Zhu went to bed and Meng left the residence to go to a poker game.

When Meng left the residence, the security system was activated. When he returned at about 12:30 a.m. the next morning (March 7), Zhu was awakened by the sound of the garage door opening. Then, at about 3:00 a.m., she was awakened again—this time by Jia Jia and Ruby's screams in the next room. Upon hearing the screams, Zhu exited the room in which she had been sleeping and stepped into the hallway, whereupon she was attacked, too, and stabbed four times.

The assailant was an intruder who had gained "unrestricted, undeterred, and undetected access into the [residence]" through a sliding glass door to the backyard. Although the intruder "did not have any

5

professional tools to break into the [residence]" that evening, he had been able to gain access because the "sliding glass door was unlocked and the security system was not armed, making it so he could easily and silently enter." "[I]f the . . . sliding glass door *[had been]* locked and/or the security alarm *[had been]* armed, [the assailant] would have been deterred from breaking into the [residence] and/or . . . the noise from . . . breaking into the [residence] and/or the security alarm would have caused [Meng] to wake up and prevent the attack and injuries."

## II.
## Discussion

The existence of a legal duty to act reasonably under the circumstances is an essential element of a negligence theory of action that we review de novo. (See *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 669.)

Ordinarily one who has not created a peril has no duty to protect another from that peril. (See *Kuciemba v. Victory Woodworks Inc.* (2023) 14 Cal.5th 993, 1016 (*Kuciemba*).) But in some instances one does have such a duty. (See, e.g., *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 215 (*Brown*).) Thus, for example, an owner or possessor of real property owes " 'a duty to take reasonable steps to protect persons on the property from physical harm caused by the foreseeable conduct of third parties,' including foreseeable criminal acts." (*Hanouchian v. Steele* (2020) 51 Cal.App.5th 99, 107 (*Hanouchian*).)

Recognition of a legal duty to protect another from the foreseeable criminal acts of a third party is governed by a two-step inquiry: First, the court must inquire into the existence of either a special relationship between the parties or of a negligent undertaking of aid, giving rise to an affirmative duty to protect. (*Brown, supra,* 11 Cal.5th at pp. 211, 213, 221-222.) Second,

6

if such a relationship or such circumstances exist, then the court must consider a set of factors articulated in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*, and the *Rowland* factors) to decide whether policy considerations nonetheless militate in favor of limiting or not recognizing that affirmative duty. (*Brown,* at pp. 211, 213, 221-222.)

Turning to step one of this analysis, i.e., the existence of a special relationship giving rise to a duty to protect, we note that Zhu was an overnight guest in Meng's home, Meng perceived the threat of a violent home invasion to be very real, and it is plausible (albeit not specifically alleged in the complaint) that Zhu took comfort in the security protocols she had observed Meng engaging in, that she relied on him engaging in those protocols, and that Meng was aware of her reliance.

On these allegations and inferences, we assume but do not decide that there may have been a special relationship that gave rise to an affirmative duty on the part of Meng to protect Zhu. (*Allen v. Liberman* (2014) 227 Cal.App.4th 46, 50 [hosts "had . . . special relationship with [overnight guest]

because she was an invited guest in their home" [2]]; *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 155 fn. 17 [a "special relationship . . . [may be] based on a . . . residential host-guest relationship"]; *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 620–621 (*Regents*) ["Generally, [a special] relationship has an aspect of dependency in which one party relies to some degree on the other for protection."].)  Instead, we focus our analysis on step two of the analysis.  We begin by reciting the *Rowland* factors.

> "In the passage of *Rowland* that has now become a touchstone of our negligence jurisprudence, we summarized the policy considerations that guide the inquiry.  To depart from the general principle that all persons owe a duty of care to avoid injuring others, we explained, 'involves the balancing of a number of considerations': 'the foreseeability

---

[2]  Notably, the duty that a host owed to social guests in his home was much narrower at common law than it is now.

> "[Under common law], landowners owed a duty of reasonable care only to 'invitee[s],' which [the California Supreme Court] described in *Rowland* as meaning 'business visitor[s].'  [Citation.] Licensees, by contrast— including social guests—were owed only a duty to refrain from 'wanton or willful injury.' [Citation.] The general idea was that invitees whose entrance benefited the landowner in some way—patrons at a grocery store, for example— could reasonably expect that the landowner would take precautions to protect them from dangerous conditions of the premises.  But not so for social guests."

(*Hoffmann v. Young* (2022) 13 Cal.5th 1257, 1280 (conc. opn. of Kruger, J.).)

Then, "in *Rowland*, [the California Supreme Court] . . . discard[ed] [this rule] in favor of the modern approach . . . appl[ied] today." (*Hoffmann, supra,* 13 Cal.5th at p. 1280; cf. *Rowland, supra*, 69 Cal.2d 108 [recognizing duty of host to eliminate or warn social guest of latent defect on premises].)  As a consequence, following *Rowland*, "a victim's status as a . . . licensee, or invitee cannot be determinative of a landowner's duties." (*Brown, supra*, 11 Cal.5th at p. 217.)

of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' "

(*Brown, supra,* 11 Cal.5th at p. 217, quoting in part *Rowland, supra,* 69 Cal.2d at pp. 112-113.)[3]

In assessing the *Rowland* factors, we focus " 'not . . . on the facts of the particular case before us,' " but rather, " 'at a relatively broad level of generality,' " on " 'whether carving out an entire category of cases from [the] general duty rule is justified by clear considerations of policy.' " (*Kuciemba, supra,* 14 Cal.5th at p. 1021.)[4] "In other words, the duty analysis is categorical, not case specific." (*Regents, supra*, 4 Cal.5th at p. 629.)

Our Supreme Court has explained a four-step analysis for courts to apply in considering the *Rowland* factors:

1. First, the court identifies the specific actions that the plaintiff claims the defendant had a duty to undertake to prevent harm;

---

3    The first three *Rowland* factors are sometimes referred to as foreseeability factors, and the last four as policy factors. (See, e.g., *Regents, supra,* 4 Cal.5th at pp. at 629-632.)

4    The "general duty rule" is codified at Civil Code section 1714, subdivision (a) which provides in relevant part that "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." But the same duty is not imposed when the plaintiff's injuries were inflicted by a third party. (*Kuciemba, supra*, 14 Cal.5th at p. 1017.)

9

2. Next, the court analyzes how financially and socially burdensome these measures would be;

3. Then, the court identifies the nature of the third-party conduct that could have been prevented by these measures and assess how foreseeable it was that the conduct would occur;

4. Finally, the court balances the burden with the foreseeability. "The more certain the likelihood of harm, the higher the burden the court will impose; the less foreseeable the harm, the lower the burden the court will [impose]."

(*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213–1214 (*Castaneda*).)

Applying *Castaneda*'s analytical framework to the case presented here, we begin by identifying the duty, and then we separately assess and then balance foreseeability and burden.

Zhu contends that Meng had the duty "to use the safety precautions that were already in place" and "to ensure that all doors of the residence are properly locked and secured and that the security alarm is turned on prior to going to bed." Zhu argues that these measures are minimal and posed "zero burden" to Meng. The third-party conduct on the night in question, i.e., deadly violence by a late-night intruder, may well have been prevented by a locked patio door or a sounding alarm.

But as to foreseeability, " 'with hindsight, everything is foreseeable.' " (*Colonial Van & Storage, Inc.* (2022) 76 Cal.App.5th 487, 502 (*Colonial Van*).) Because "rarely is anything completely unforeseeable," courts use "a subjective reasonableness standard in determining whether the degree of foreseeability is high enough to impose a duty on the defendant to act on it." (*Tucker v. CBS Radio Stations, Inc.* (2011) 194 Cal.App.4th 1246, 1253; see also *Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 306–307.)

"Unfortunately, random, violent crime is endemic in today's society." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678). On the other hand, "it is difficult if not impossible . . . to predict when a criminal might strike." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1150 (*Wiener*).) The prevalence of crime "does not make a particular criminal act foreseeable for purposes of a duty analysis" under California law. (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 538 ["[M]ore than a general prospect of danger is required 'before we can hold a defendant liable for the criminal acts of third parties' "]; see *Hanouchian, supra*, 51 Cal.App.5th at p. 111, quoting in part *Wiener*, at p. 1150.)

The foreseeability of the acts of a third party has been found to be greater when the defendant is aware of the danger posed by a specific person. (*Regents, supra*, 4 Cal.5th 607 [university could foresee that a specific, potentially violent student might harm other students]; *Pamela L. v. Farmer* (1980) 112 Cal.App.3d 206 [defendant knew her husband had molested children in the past].) Foreseeability is also greater when a specific location has a particular susceptibility to crime (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269 [murder was a foreseeable result of a missing pane of front door glass where at least one prior incident had occurred involving an aborted entry by an intruder, and assaultive crimes had been reported in other apartments in the building]); or where the criminal act occurs in real time in the defendant's presence (see, e.g., *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 245 [duty to respond reasonably to criminal conduct that is occurring in the defendant's presence]; *Morris v. De La Torre* (2005) 36 Cal.4th 260, 264 [proprietor's duty to respond reasonably to criminal conduct that is imminent or ongoing in her presence]).

11

Here, there were no allegations of prior threats or actions by the intruder that would have alerted Meng to a specific and imminent danger; nor were there prior incidents to put Meng on notice that the early morning hours of March 7, 2021, would be the time when an intruder would attempt to gain entry to his home. It is not alleged that Meng failed to act appropriately while the attack was underway.

There is an additional layer to the foreseeability analysis here, namely the foreseeability that an unlocked door would lead to violent murder, as opposed to burglary, theft or vandalism. (See, e.g., *Colonial Van*, *supra*, 76 Cal.App.5th at p. 504 [attacker's "deranged and motiveless attack" was sufficiently unlikely that the court found no causal nexus between the defendant's conduct and the injury suffered].)

In short, Meng's failure to check the patio door and set the alarm was not "sufficiently likely" to result in the attack on Zhu and the deaths of Meng's wife and daughter. (*Regents*, *supra*, 4 Cal.5th at p. 629.)

As to the financial and social burden that would result from a finding of duty owed to overnight guests in a private home, we are not persuaded that the burden is as minimal as Zhu argues. Because of the generalized nature of the risk, the true burden would be that every night of the year, in private residences in which people are sleeping (or otherwise vulnerable), at least one adult in the home would bear a legal duty to check all doors and windows to ensure they were locked, and to arm an alarm if the house had an alarm system. We question whether such a duty would be "workable" (*Castaneda*, *supra*, 41 Cal.4th at p. 1216), particularly in light of the many questions such a requirement would pose: e.g., which adult(s) in the home bears the duty? What is the correct time for the lock check? Would this duty only apply to homes in neighborhoods known for crime? If so, what would be the standard

12

for determining which neighborhoods fall within that category?  Would people living in more secure, affluent communities bear a lower duty to their guests than those living in neighborhoods afflicted by crime?

Although Zhu is correct that the financial cost of using existing locks and alarms would be low, the social costs may well be much higher.  A person living in a private residence would have to think twice before inviting a guest to spend the night, lest she incurs a legal duty beyond her ordinary routine.  Something as benign as falling asleep in front of the television or leaving a door unlocked for a late-arriving family member might result in liability to others in the home.  "A finding of duty may be inappropriate if its recognition would deter socially beneficial behavior." (*Kuciemba, supra,* 14 Cal.5th at p. 1028.)

Further, as to "the policy of preventing future harm" (*Rowland, supra,* 69 Cal.2d at pp. 112-113), "[p]lacing the cost of negligence on responsible parties is generally thought to induce behavioral changes that will make the activity in question safer." (*Kuciemba, supra,* 14 Cal.5th at p. 1026.)  But here, it is hard to see how imposing such a cost on an overnight social host would induce any change in behavior.  A host such as Meng is already highly motivated to act to avoid harm to his loved ones (and himself) and thus to act with prudence and caution, particularly as to non-specific risks created by unknown third parties.

Finally, as to the "availability, cost, and prevalence of insurance for the risk involved" (*Rowland, supra,* 69 Cal.2d at p. 113), although homeowners policies may cover the damage caused by criminals to non-family members in the home, there may be serious unintended consequences to the availability

13

of insurance and its cost in California if a homeowner's legal duty is extended as Zhu suggests.[5]

In sum, when we "balance[] the burden with the foreseeability", Castaneda, supra, and consider all the *Rowland* factors, we conclude that "clear considerations of policy" justify "carving out an entire category of cases from the general duty rule." Accordingly, Meng did not owe a legal duty to Zhu.

### III.
### Disposition

The judgment is affirmed. Meng is entitled to costs on appeal.

KELETY, J.

WE CONCUR:

BUCHANAN, Acting P. J.

RUBIN, J.

---

[5] Two *Rowland* factors are sufficiently clear that lengthy discussion is unnecessary. As to certainty of injury, there is no doubt that Zhu suffered serious injuries from the attack. As to moral blame for Meng's failure to check the patio door, while Zhu asserts Meng is morally culpable because he knew his failure created the potential for a "dangerous burglary," we do not consider his one-time oversight to be a moral failure. "[M]oral blame is typically found when the defendant reaps a financial benefit from the risks it has created," (*Kuciemba, supra,* 14 Cal.5th at p. 1025), which is not alleged to be the case here.