Filed 9/16/22  Stone v. Palos Verdes Family and Immediate Medical etc. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| BRADLEY STONE et al., | B312722 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC701442) |
| v. | |
| PALOS VERDES FAMILY AND IMMEDIATE MEDICAL CARE GROUP, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary Y. Tanaka, Judge.  Affirmed.

The Novak Law Firm and Sean M. Novak for Plaintiffs and Appellants.

Carroll, Kelly, Trotter & Franzen, John C. Kelly, and David P. Pruett for Defendant and Respondent.

—————————————

Plaintiffs and appellants Bradley and Samuel Stone (the Stones) appeal from the trial court's order granting defendant and respondent Palos Verdes Family and Immediate Medical Care Group's (PV Medical Care) motion for summary judgment in this action for premises liability, negligent supervision, gross negligence, negligence, and intentional infliction of emotional distress. The trial court concluded the Stones were unable to establish PV Medical Care owed them a duty of care or that it engaged in extreme or outrageous conduct. We affirm the judgment.

## BACKGROUND

### A.      Factual Background

On April 10, 2017, Bradley Stone went to PV Medical Care's urgent care clinic to seek medical advice.[1] Bradley was a regular patient of the clinic. He was accompanied by his adult son, Samuel. After Bradley signed in, the Stones took seats next to each other in the waiting room.

Several minutes later, Marco Moine arrived. Moine had been a patient of Dr. Christopher Traughber, one of the principals of PV Medical Care, for approximately three years. Moine had "generalized anxiety" and received a regular prescription for Klonopin, an anti-anxiety medication, to which he was habituated. Traughber had also prescribed Ambien to Moine for insomnia. Moine approached the intake window and stated he had a foot injury. The medical receptionist, Kelly Morris, told Moine his insurance no longer covered him. Moine replied, "ok, I'll pay, but if the doctor doesn't give me any pain

---

[1] To avoid confusion, we refer to the Stones individually by first name only. No disrespect is intended.

meds, I want my fucking money back, and I'll get it back." Morris replied that it was up to the doctor. Moine then sat down across from the Stones in the last open seat.

For approximately five minutes, Moine mumbled to himself and swore under his breath. He then stood and began pacing. Moine approached and shook the television, swearing. An older man seated in the waiting room told Moine he was watching the television, which was on a news program that was reporting on a school shooting.

Moine walked to the intake window again and yelled, "I want to change that television channel," but Morris did not respond. Morris later declared she did not hear any voices in the waiting room well enough to understand the words used. Her workstation was a desk behind an opening in the wall. She was unable to see the interior of the waiting room from her workstation, both because she was seated at a desk and because she was short in stature.

However, Jose Guico, a medical assistant and x-ray technician at PV Medical Care, heard Moine's request and entered the waiting room. An older man informed Guico he was watching the program. Moine responded, "I don't fucking care, I don't want to watch this." He stood and continued to yell at the older man. Bradley suggested that Moine "go outside and calm down, or perhaps wait in his car," to which Moine responded, with profanity, that he did not have a car and would do what he wanted. According to Bradley, Moine stood over him "in a menacing manner." Guico indicated he would not change the channel and Moine sat down. Guico left the room.

Moine then stood again and approached Bradley. Samuel asked the other patrons in the waiting room to take a vote as to

3

whether the television should remain on. The majority of the patrons voted to keep the television on the same channel. Moine paced before retaking his seat across from the Stones. According to the Stones, Moine stared at them while "erratically shifting back and forth in his chair with his fists balled." After a minute or so, Moine stood and approached Samuel. Bradley stood, put out his hands, and told Moine to stop. Moine punched Bradley in the face, slammed him to the ground, and continued punching him.

Morris heard voices get louder, "but not to the point of yelling or screaming." A few seconds later she heard chairs being moved and scuffling, then something hitting the floor. She immediately called out for help. Samuel was shocked and took no action for approximately 30 seconds to one minute. He then pulled Moine off Bradley.

In the meantime, Guico was in a treatment room with a patient when he heard Morris call out for assistance. He asked the patient to wait and ran to the waiting room, where he observed Bradley on the ground with Moine standing over him. Using martial arts techniques, Guico separated Moine and Bradley. Another x-ray technician accompanied Guico and assisted with Samuel.

According to the Stones, approximately three minutes passed between the beginning of Moine's attack and Guico's intervention. According to Guico, he responded to Morris's call for assistance within 30 to 45 seconds. The Stones estimated that approximately 10 minutes passed between Moine's first signs of "aggressive and violent behavior" and the attack.

## B. Procedural Background

In April 2018, the Stones filed their complaint against PV Medical Care and Moine, asserting claims of premises liability, negligent supervision, intentional infliction of emotional distress, gross negligence/reckless misconduct, and negligence against PV Medical Care. They alleged claims of assault, battery, intentional infliction of emotional distress, gross negligence, and negligence against Moine. The complaint sought punitive damages in connection with the intentional infliction of emotional distress and gross negligence claims.

In March 2020, PV Medical Care moved for summary judgment, or, in the alternative, summary adjudication of the Stones' claims against it. PV Medical Care argued it had no duty to protect the Stones from Moine's attack, it had no notice the attack would take place, and it did not cause the attack.

In support of its motion, PV Medical Care submitted declarations from its principals and employees indicating Moine's attack was unprecedented in the history of the clinic. PV Medical Care's three principals declared they have operated the clinic since 1995 and had never known or heard of an altercation between patients, other than the incident between Moine and the Stones. Guico and another employee similarly declared they had never witnessed any altercations between patients during the time they had worked for the clinic, approximately 15 years and 25 years, respectively. Dr. Traughber, Guico, and Morris also declared they had never witnessed Moine engage in any conduct or display any demeanor that suggested he would behave in the manner alleged by the Stones. Moine had visited the clinic on 33 occasions over approximately three years. Guico and Morris also

described their perception of the events leading up to the attack and their response to the attack.

PV Medical Care additionally submitted the declaration of Dr. Suzanne M. Dupée, who opined, based on her review of the record, that Moine's attack was not the result of a "psychiatric emergency," as the Stones claimed.

In support of their opposition to the motion for summary judgment, the Stones submitted their own declarations as well as the declaration of psychologist Dr. Stephen Poulter. Dr. Poulter opined that PV Medical Care failed to follow proper and reasonable safety procedures for the safety of patients and staff. Dr. Poulter also opined that PV Medical Care should have known Moine was a high risk to others and himself, and it was evident Moine was having a "serious mental emergency in the waiting room" of the clinic. The Stones also submitted negative Yelp reviews that purportedly reflected evidence of prior events similar to the attack on the Stones. The reviews primarily consisted of complaints concerning long wait times and staff service; none referenced altercations between patients.

PV Medical Care filed objections to the declarations of the Stones, asserting their estimates of time were lay opinion and their description of events after the attack were irrelevant. PV Medical Care similarly objected that Dr. Poulter's declaration described events subsequent to the attack, which were irrelevant. It also argued the declaration opined on Moine's mental state and industry safety standards even though Dr. Poulter lacked the required special knowledge, skill, experience, training, and education to proffer opinions on those subjects. PV Medical Care further objected to the Yelp reviews on the grounds that they were unauthenticated, unsworn, and hearsay.

6

On February 1, 2021, following oral argument, the trial court granted summary judgment in favor of PV Medical Care. The court overruled PV Medical Care's objections to the Stones' declarations and its objection to the declaration of Dr. Poulter that events after the attack were irrelevant. The court sustained PV Medical Care's remaining objections to Dr. Poulter's declaration. The court also sustained PV Medical Care's objection to the Yelp reviews.

Turning to the merits, the court found PV Medical Care "met its initial burden to show that Plaintiffs' causes of action have no merit by showing that one or more element of the causes of action cannot be established" and the Stones had "no admissible substantive evidence to establish that Defendant owed a duty of care." The court observed that the Stones' "causes of action for Premises Liability, Negligent Supervision, Gross Negligence/Reckless Misconduct, and Negligence all require [the Stones] to provide specific facts to meet the familiar elements of negligence, including duty of care, breach, causation, and damages."

The trial court explained that whether a duty exists is a question of law and the scope of a duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. It found there was "no competent evidence to establish the existence of prior criminal violent assaults by Mr. Moine and/or by any other individual at Defendant PV Medical Center's facility waiting area." It further found that "even taking the facts in the light most favorable to Plaintiffs, it would not be foreseeable that someone exhibiting the conduct allegedly demonstrated by Mr. Moine would lead to an unprovoked criminal assault upon [the Stones]." The court noted "there [was]

7

no evidence that Mr. Moine had previously demonstrated the type of aggressive behavior he exhibited," "there [was] no evidence that Mr. Moine was in fact under the influence of Klonopin on the date of the attack which led to his erratic actions," and "there [was] no evidence that not being under the influence of Klonopin would lead Mr. Moine to undertake an attack." Moreover, there was no competent medical evidence to demonstrate that Moine was in the midst of a mental health emergency. The court concluded the Stones did "not set forth sufficient evidence to meet the foreseeability component to establish the existence of a duty of care." It therefore held that the premises liability, negligent supervision, gross negligence, and negligence claims failed. The trial court also ruled there was no competent evidence of extreme or outrageous conduct to establish an intentional infliction of emotional distress claim, and no basis for punitive damages because there was no triable issue of material fact as to the underlying causes of action. The matter would proceed against Moine.

Judgment was entered in favor of PV Medical Care on April 27, 2021. The Stones timely appealed.

## DISCUSSION

## I. Negligence, Premises Liability, and Gross Negligence

"An action in negligence requires a showing that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered by the plaintiff." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 (*Ann M.*), disapproved of on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, fn. 5.) "The elements of a negligence claim and a premises liability claim are the same: a legal duty of care,

8

breach of that duty, and proximate cause resulting in injury." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158.) Gross negligence similarly requires a showing of the traditional elements of negligence, as well as conduct reflecting either want of even scant care or an extreme departure from the ordinary standard of care. (*Chavez v. 24 Hour Fitness USA, Inc.* (2015) 238 Cal.App.4th 632, 640.)

The trial court concluded the Stones failed to establish that PV Medical Care owed a duty to them, an essential element of all three negligence-based causes of action. "Whether and to what extent defendant owed a duty to plaintiff is a question of law for the court to resolve. [Citations.] We determine de novo the existence and scope of that duty. [Citation.]" (*Williams v. Fremont Corners, Inc.* (2019) 37 Cal.App.5th 654, 662.) Likewise, "[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court." (*Ann M.*, *supra*, 6 Cal.4th at p. 678.)[2]

" 'Although duty is a legal question, the factual background against which we decide it is a function of a particular case's procedural posture.' [Citation.] On review of an order granting summary judgment, we independently examine the record to determine whether triable issues of fact exist to reinstate the action. [Citation.] In doing so, we view the evidence in the light most favorable to [the Stones] as the part[ies] opposing summary judgment, liberally construing [their] evidentiary submissions

---

[2] The Stones assert in their opening brief that the court erroneously made a finding of fact with regards to the existence of a duty and the foreseeability of the attack. In their reply brief, the Stones appear to concede that both duty and foreseeability are questions of law.

and strictly scrutinizing the evidence submitted by [PV Medical Care]. [Citation.]" (*Williams v. Fremont Corners, Inc.*, *supra*, 37 Cal.App.5th at pp. 662–663.) We consider all of the evidence set forth in the moving and opposing papers, except that to which objections were made and sustained. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.)

" ' 'An issue of fact can only be created by a conflict of evidence. It is not created by "speculation, conjecture, imagination or guess work." [Citation.] Further, an issue of fact is not raised by "cryptic, broadly phrased, and conclusory assertions" [citation], or mere possibilities [citation]. "Thus, while the court in determining a motion for summary judgment does not 'try' the case, the court is bound to consider the competency of the evidence presented." [Citation.]' [Citation.] Responsive evidence that 'gives rise to no more than mere speculation' is not sufficient to establish a triable issue of material fact. [Citation.]" (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 889–890.)

## A. Guiding principles regarding landowner's duty to protect against injury from third party conduct on the premises

"Although '[a]s a general principle, "a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous" ' [citations], it also is well established that, as a general matter, there is no duty to act to protect others from the conduct of third parties." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 234–235 (*Delgado*).) However, "[a] defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a 'special relationship' with the other person. [Citations.] Courts have found such a

10

special relationship in cases involving the relationship between business proprietors such as shopping centers, restaurants, and bars, and their tenants, patrons, or invitees." (*Id.* at p. 235.)

Courts employ a four-step analysis when determining whether a duty of care exists. " 'First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on the landlord.' " (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214, citing *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 285.)

" ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may

11

be required." [Citation.]' [Citation.] . . . [D]uty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures." (*Ann M.*, *supra*, 6 Cal.4th at pp. 678–679.)

Our Supreme Court has clarified the scope of a landlord's duty with respect to both preventing third party attacks and responding to third party attacks. In *Ann. M.*, the plaintiff, an employee of a store located in a shopping center, was raped at her place of employment by an unknown assailant. (*Ann. M.*, *supra*, 6 Cal.4th at pp. 670–671.) The issue presented was whether the scope of the landowner's duty to maintain the common areas in a reasonably safe condition included providing security guards in those areas. (*Id.* at p. 670.) The Supreme Court "conclude[d] that violent criminal assaults were not sufficiently foreseeable to impose a duty upon Pacific Plaza [the landowner] to provide security guards in the common areas. [Citation.] First, Pacific Plaza did not have notice of prior similar incidents occurring on the premises. Ann M. allege[d] that previous assaults and robberies had occurred in the shopping center, but she offer[ed] no evidence that Pacific Plaza had notice of these incidents. While a landowner's duty includes the duty to exercise reasonable care to discover that criminal acts are being or are likely to be committed on its land [citation], Pacific Plaza presented uncontroverted evidence that it had implemented 'a standard practice . . . to note or record instances of violent crime' and that Pacific Plaza's records contain[ed] no reference to violent criminal acts prior to Ann M.'s rape. Moreover, even assuming that Pacific Plaza had notice of these incidents, Ann M. concede[d] that they were not similar in nature to the violent

12

assault that she suffered.  Similarly, none of the remaining evidence presented by Ann M. [was] sufficiently compelling to establish the high degree of foreseeability necessary to impose upon Pacific Plaza a duty to provide security guards in the common areas.  Neither the evidence regarding the presence of transients nor the evidence of the statistical crime rate of the surrounding area [was] of a type sufficient to satisfy this burden." (*Id.* at pp. 679–680; *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1185-1186, 1195 (*Sharon P.*)[3] [violent third party sexual assault in underground parking garage not sufficiently foreseeable to require hiring of security guards where no assaults occurred in garage in 10-year period prior to assault and robberies on building's ground floor not sufficiently similar].)

*Delgado* concerned the response to a third party attack.  In *Delgado, supra*, 36 Cal.4th 224, the plaintiff's wife approached one of the defendant bar's two guards and expressed concern that there was going to be a fight.  The guard then noticed hostile stares between the plaintiff and other bar patrons and concluded a fight was imminent.  (*Id.* at p. 231.)  The guard asked the plaintiff and his wife to leave.  (*Ibid.*)  Once in the parking lot, between 12 and 20 men accosted the plaintiff.  (*Ibid.*)

The Supreme Court explained that "[e]ven when proprietors . . . have no duty under *Ann M.* and *Sharon P.* to provide a security guard or undertake other similarly burdensome preventative measures, the proprietor is not necessarily insulated from liability under the special relationship

---

[3] Disapproved on other grounds in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, footnote 19, and *Reid v. Google, Inc., supra* 50 Cal.4th at page 527, footnote 5.

13

doctrine." (*Delgado, supra,* 36 Cal.4th at p. 240.) Under the circumstances in *Delgado,* there was "insufficient evidence of heightened foreseeability in the form of prior similar incidents or other indications of a reasonably foreseeable risk of a violent criminal assault" to require preventative measures, but the defendant did owe a "duty to respond to events unfolding in its presence by undertaking reasonable, relatively simple, and minimally burdensome measures." (*Id.* at p. 245.) Such measures included attempting to dissuade the group that attacked plaintiff from following him out of the bar and confirming that the outside guard was at his post to help maintain the separation between plaintiff and that group. (*Id.* at pp. 246–247.)

In *Morris v. De La Torre* (2005) 36 Cal.4th 260 (*Morris*), the Supreme Court similarly recognized that "even if a proprietor . . . has no special-relationship-based duty to provide security guards or other similarly burdensome measures designed to prevent *future* criminal conduct (which measures are required only upon a showing of 'heightened foreseeability'), such a proprietor nevertheless owes a special-relationship-based duty to undertake reasonable and minimally burdensome measures to assist customers or invitees who face danger from imminent or ongoing criminal assaultive conduct occurring upon the premises." (*Id.* at p. 270.) The plaintiff in *Morris* was attacked in the parking lot outside a restaurant in full view of restaurant employees. (*Id.* at p. 266.) The attacker had run into the restaurant and grabbed an approximately 12-inch knife from the kitchen, which he used to stab the plaintiff numerous times. (*Id.* at pp. 266–267.) Restaurant employees watched the entire altercation but failed to call the police or take any other action. (*Id.* at p. 267.)

14

The court explained that the "foreseeability analysis in a case such as [*Morris*]—involving a proprietor's duty to *respond* reasonably to criminal conduct that is *imminent* or even *ongoing* in his or her presence—contrasts fundamentally with the type of foreseeability at issue in cases such as *Ann M.*, which involve a proprietor's duty to take preventative measures to guard against possible *future* criminal conduct." The question posed in cases where the conduct is imminent or ongoing is "whether those employees (as agents of defendant) owed any duty to plaintiff to take reasonable action for his protection at some point during that ongoing conduct." (*Morris, supra*, 36 Cal.4th at p. 271.) It found "as a general matter a proprietor's special-relationship-based duty to its patrons or invitees includes an obligation to make [a 911] call, or to take other similar minimal measures." The court therefore could not "conclude as a matter of law that defendant's employees acted reasonably in declining to place a 911 call or undertake any other minimally burdensome measure on plaintiff's behalf." (*Id*. at pp. 277–278.)

With these principles in mind, we turn to the evidence in this case.

### B.    Analysis

The Stones asserted in opposition to summary judgment that "minimal measures 'reasonable under the circumstances' would have included having the Defendants intervene where it was obvious Defendant Moine was having a mental health emergency BEFORE he attacked anyone." The Stones further argued that "[o]nce the attack did begin, Defendant PV was obligated to provide IMMEDIATE assistance as there was a violent attack occurring on their premises AND should have immediately called 911 for assistance." We address the issues of

15

PV Medical Care's duty to prevent an assault and the duty to respond to an ongoing assault separately.

We first consider "the 'burdensomeness, vagueness, and efficacy' of the proposed security measures" the Stones believe would have averted the incident entirely. (*Ann M., supra,* 6 Cal.4th at p. 679.) On appeal, the Stones assert the attack could have been avoided had PV Medical Care called the police based on Moine's behavior. Before the trial court, the Stones asserted that PV Medical Care "should have isolated Defendant Moine and/or required him to leave the premises" before the attack took place.

As an initial matter, we note the trial court sustained PV Medical Care's objection to portions of the declaration of the Stones' medical expert, including his characterization of Moine's behavior as a mental health emergency. The Stones do not challenge this ruling on appeal. Any assertion that Moine was in the midst of a mental health emergency is therefore unfounded in the record. Similarly, there is no evidence indicating Moine posed a greater risk to others because of his generalized anxiety or his prescribed medications.

There is also no evidence that Moine verbally threatened anyone or that any patient (including the Stones) informed PV Medical Care employees that they found Moine's behavior concerning. Thus, the Stones' proposed measures would require PV Medical Care to call the police or remove or isolate patients whenever one of its employees noticed someone raising his or her voice, swearing, and disagreeing with others in the waiting room. We cannot agree that imposing such duties is a "minimal burden" as the Stones claim. Irritability is not uncommon in urgent care patients who are injured or unwell and awaiting treatment. PV

16

Medical Care persuasively argues it would negatively impact the relationship with its patients and burden police resources if PV Medical Care called 911 to preempt potential physical assaults based on argumentative manners alone. Coordinating and dealing with these police interventions would also divert staff attention, potentially exacerbating the wait times that are already a common cause for customer complaints about urgent care facilities.

Further, our high court has recognized that "neither a business proprietor nor his or her employees have an absolute obligation to call 911 in the face of ongoing criminal conduct: in some situations, doing so actually might increase the danger to customers or invitees or might unreasonably place proprietors or their employees in danger." (*Morris*, *supra*, 36 Cal.4th at p. 277.) Here, involving the police in similar situations might escalate rather than defuse a patron's otherwise manageable annoyance and place PV Medical Care employees and other patients at increased risk of violence. Moreover, Moine's behavior prior to the assault, while disruptive and even obstreperous, was not obviously criminal. We are aware of no legal authority for the proposition that a business proprietor or its employees have an obligation to call law enforcement to respond to noncriminal conduct. The proposed measure of calling the police imposes more than a minimal social and financial burden on PV Medical Care and is of questionable efficacy.

The proposed measure of isolating or removing disagreeable patients imposes similar, if not greater, social and financial burdens. Patients who are asked or required to leave the waiting area under such circumstances may choose to seek treatment elsewhere. As with calling the police, there is a

17

possibility that asking patients to leave may exacerbate the situation and place PV Medical Care's employees and other patients at increased risk of harm. To the extent this measure includes forcibly removing or isolating patients who will not go willingly, PV Medical Care exposes itself to legal liability—for example, for the use of unreasonable force in ejecting the individual. (See Civ. Code, § 50; Rest.2d Torts, § 86.) Moreover, requiring that PV Medical Care have an employee available to monitor the waiting room and forcibly remove patrons is tantamount to requiring that PV Medical Care retain a security guard. The Supreme Court has explained that the hiring of guards "will rarely, if ever, be found to be a 'minimal burden.' The monetary costs of security guards is not insignificant. Moreover, the obligation to provide patrols adequate to deter criminal conduct is not well defined. . . . [W]e conclude that a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards. We further conclude that the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises."[4] (*Ann M.*, *supra*, 6 Cal.4th at pp. 678–679.)

---

[4] The Stones have referenced Moine's "psychological conditions" as a factor that rendered the attack foreseeable and warranted PV Medical Care "isolat[ing]" or removing Moine from the premises. PV Medical Care argues there would be potential social and legal costs associated with it making assumptions about anticipated behavior, and taking resulting actions such as refusing medical care, based on a patient's mental condition or disability. To the extent the Stones argue that, based on a patient's mental health condition, PV Medical Care had an

Turning to the foreseeability of the attack, it is undisputed that there had been no previous altercations at PV Medical Care's office. PV Medical Care's three principals and two of its employees declared they had never known or heard of an altercation between patients, other than the incident between Moine and the Stones. The doctor who treated Moine and two employees who interacted with Moine also declared they had never witnessed behavior suggesting that Moine would attack anyone. In their opposition below, the Stones relied on negative Yelp reviews in support of their claim that the attack on the Stones was not unprecedented. However, the trial court sustained PV Medical Care's objection to these reviews, and also found that there was nothing in the Yelp reviews to establish any prior criminal events in the clinic. Thus, the undisputed evidence supports that Moine's attack was unprecedented in the clinic's more than 20-year history and that Moine had never behaved violently at the clinic in the past.

The Stones contend the attack was nevertheless foreseeable to PV Medical Care based on the events leading up to it. "[F]oreseeability must be measured by what the defendant actually knew." (*Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 156.) In other words, we are concerned with what happened

---

obligation to call the police or remove a patient from the premises in response to noncriminal behavior, we agree that this would place a "burdensome, dubiously effective and socially questionable obligation on [PV Medical Care], at least absent circumstances showing [physical] violence was extraordinarily foreseeable." (*Castaneda v. Olsher, supra,* 41 Cal.4th at p. 1217 [rejecting claim that landlord had obligation to not rent to gang members because of risk of gang violence].)

in the presence of PV Medical Care's employees, not on "constructive knowledge or information the defendant should have known." (*Ibid.*)  The evidence showed two PV Medical Care employees, Morris and Guico, observed or heard Moine swearing and behaving in an agitated manner for relatively short periods prior to the attack.

This behavior was not sufficient to establish that a violent attack was reasonably foreseeable to PV Medical Care or its employees.  It is undisputed that when Guico left the waiting room, he had informed Moine that the television channel could not be changed and Moine retook his seat.  There was no evidence that Moine resumed yelling after Guico left.  While the Stones suggest Moine's "psychological condition" made the attack more foreseeable, there was no evidence connecting Moine's diagnosis with any actual or threatened violent behavior in the past.  Though Moine had displayed annoyance on two or three prior occasions, Guico stated in his declaration that Moine had "never posed any type of physical threat."  Based on this history and Moine's behavior at the time Guico departed the room, there was little reason to expect the situation would escalate to violence. (See *Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 596 [tenant's battery not foreseeable to landlord where past conduct was harassment, verbal insults, annoyance of another tenant, but no prior assault or battery]; *Davis v. Gomez* (1989) 207 Cal.App.3d 1401, 1406 [no landlord duty where tenant's mental condition was deteriorating and tenant engaged in erratic, possibly aggressive behavior; not foreseeable that behavior would escalate to shooting another tenant].)

The Stones asserted in their declarations that they observed Moine's aggressive manner for "well over ten (10)

minutes" before the attack took place. The evidence viewed in the light most favorable to the Stones would support a finding that the Stones were in Moine's presence significantly longer than any PV Medical Care employee and thus had a greater opportunity to observe his manner. However, neither they nor any of the other patients in the waiting room raised concerns to any PV Medical Care employees about Moine's behavior. Thus, the circumstances here are distinguishable from those present in *Delgado*, where the plaintiff's wife approached the guard with her concern that a fight was imminent and the guard then observed the "hostile stares" between the plaintiff and other bar patrons and reached the same conclusion about the potential danger of the situation. (*Delgado, supra,* 36 Cal.4th at p. 231.) There is no evidence to support the claim that any PV Medical Care employee had "actual notice of an impending assault" (*id.* at p. 250), or that they had any reason to believe Moine would lash out violently.

Weighing the burden of the Stones' proposed preventative measures against the low foreseeability that Moine would violently attack Bradley, we conclude PV Medical Care did not have a duty to prevent the attack as a matter of law. (*Ann M., supra,* 6 Cal.4th at p. 676 ["a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated"].)

We next consider whether PV Medical Care failed to respond appropriately to ongoing criminal activity after the attack began. The Stones argue PV Medical Care should have provided immediate assistance and immediately called the police. However, unlike *Morris, supra,* 36 Cal.4th 260, where the employees witnessed the offender enter the kitchen, take an approximately 12-inch knife, stab the victim multiple times, and

21

chase the victim's friends across the street, all without calling the police or taking any other actions (*id*. at pp. 266–267), the evidence viewed in the light most favorable to the Stones indicates PV Medical Care employees responded as soon as they became aware of the attack, then they physically intervened, all within three minutes. Morris called out for assistance within seconds of hearing raised voices and when she heard scuffling and something hitting the floor. Guico heard Morris call from the back of the clinic and came to assist along with another x-ray technician.[5] Morris's call for help and Guico's intervention were each " *'appropriate action as is reasonable under the circumstances.'* " (*Id*. at p. 274.) There is no evidence to support that Morris, who described herself as "short in stature," would have been able to safely separate the Stones and Moine. It would not be "minimally burdensome" to impose on landowners a duty to immediately intervene in a physical altercation without any regard for the safety of their employees. In contrast, Guico had martial arts training that he was able to implement in breaking up the fight.

With respect to whether PV Medical Care had the additional duty to call the police, the Supreme Court has explained that "as a general matter a proprietor's special-relationship-based duty to its patrons or invitees includes an

---

[5] We are not required to accept the conclusory assertion in the Stones' declarations that "NO ONE employed by [PV Medical Care] reacted or intervened" after Moine attacked. The Stones do not claim they observed Morris failing to take any action in response to the attack. There is no competent evidence to contradict that Morris called for assistance and Guico responded to her call.

22

obligation to make [a 911] call, *or to take other similar minimal measures.*"  (*Morris, supra,* 36 Cal.4th at p. 277, italics added.)  Guico and the other x-ray technician intervened and broke up the altercation, which presumably would have been the goal of calling the police.  Having undertaken to immediately and physically stop the attack, case law does not support the argument that PV Medical Care had an additional obligation to call the police.

Even accepting for purposes of discussion that PV Medical Care also had the duty to immediately call 911, summary judgment was appropriate in the absence of any evidence establishing the Stones would not have been injured but for PV Medical Care's failure to immediately call 911.  " 'A mere possibility of . . . causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it *becomes the duty of the court to direct a verdict for the defendant.*' "  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 775.)  In *Saelzler,* the Supreme Court held that summary judgment in favor of apartment complex owners was appropriate where the plaintiff, a delivery woman who was assaulted at the complex, provided no evidence that she was attacked by unauthorized persons or trespassers and therefore could not "show that defendants' failure to provide increased daytime security at each entrance gate or functioning locked gates was a substantial factor in causing her injuries." (*Id.* at p. 776.)  Here, there is no evidence demonstrating that the police, even if called immediately, would have arrived and broken up the fight before Guico and the other technician intervened.  Even if the intervention took a few minutes rather than 30 to 45 seconds, it is "pure speculation" that the Stones would not have

23

sustained their injuries but for the fact that PV Medical Care's employees did not immediately call the police once the attack began.

In sum, PV Medical Care did not have a duty to prevent the third party attack on the Stones. PV Medical Care's employees had a duty to take reasonable, minimal measures to respond to the attack once it began and they took such appropriate measures. Even if PV Medical Care had the additional duty to immediately call the police and breached that duty, there is no evidence to support the claim that PV Medical Care's failure to do so was the cause of the Stones' injuries. Thus, the Stones cannot recover for the torts of negligence, premises liability, or gross negligence.

## II.    Negligent Supervision

"An employer can be held liable for negligent supervision if it knows or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness. [Citation.] '[T]here can be no liability for negligent supervision "in the absence of knowledge by the principal that the agent or servant was a person who could not be trusted to act properly without being supervised." ' " (*Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 253.)

No evidence was offered to support the claim that any PV Medical Care employees were unfit for their jobs, that they had failed to respond appropriately to patient altercations (of which there were none) in the past, or that they failed to respond reasonably as soon as they became aware of Moine's attack on the Stones.

Moreover, PV Medical Care conceded it is vicariously liable for its employees' conduct. "Once the employer admittedly

24

becomes vicariously liable for the negligent acts of the employee, there is no remaining basis at a future trial to attempt to prove the negligence of the employer itself, such as through knowledge of the employee's prior accidents, because the subject liability has already been adequately and completely established." (*Jeld-Wen, Inc. v. Superior Court* (2005) 131 Cal.App.4th 853, 866; accord, *Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1160 [where an employer admits vicarious liability, "claims against the employer based on theories of negligent entrustment, hiring, or retention become superfluous"].)

The negligent supervision claim therefore fails as a matter of law.

## III.   Intentional Infliction of Emotional Distress

In their complaint, the Stones asserted that PV Medical Care failed to take appropriate action based on Moine's behavior and it therefore "intended to inflict severe emotional distress on [the Stones] and acted with conscious disregard of the probability of causing severe emotional distress."

The elements of the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard for the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1241–1242.)  "A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' "  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051; accord, *Cochran v. Cochran* (1998) 65 Cal.App.4th

25

488, 496 [liability has been found where conduct is " 'beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' "].)  "Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.' " (*Delaney v. Baker* (1999) 20 Cal.4th 23, 31–32.)

Whether a defendant's conduct is "outrageous" normally presents an issue of fact, but "the court may determine in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." (*Trerice v. Blue Cross of California* (1989) 209 Cal.App.3d 878, 883.)  In appropriate cases, this court can decide as a matter of law that conduct is not so extreme and outrageous as to exceed what is tolerated in a civilized society.  (*Wilkins v. National Broadcasting Co.* (1999) 71 Cal.App.4th 1066, 1087.)

As discussed above, the undisputed evidence supports that PV Medical Care was not negligent as a matter of law and there was no conduct by PV Medical Care or its employees that could reasonably be regarded as so extreme and outrageous as to permit recovery.  Accordingly, the trial court properly concluded the intentional infliction of emotional distress claim failed as a matter of law.[6]

---

[6] Because both causes of action under which punitive damages were sought fail as a matter of law, the trial court properly concluded the Stones have no basis to recover punitive damages.

## DISPOSITION

The judgment is affirmed.  PV Medical Care is awarded its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


ADAMS, J.*


We concur:



EDMON, P. J.



EGERTON, J.



---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.